## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**JOSE L. CANALES-CANCEL**,
    Plaintiff,

    v.

**COMMISSIONER OF SOCIAL
SECURITY**,
    Defendant.

Civil No. 20-1469 (BJM)

### OPINION & ORDER

Jose L. Canales-Cancel ("Canales") seeks review of the Social Security Administration Commissioner's ("the Commissioner's") finding that he is not entitled to benefits under the Social Security Act ("the Act"), 42 U.S.C. § 423. Canales argues that the administrative law judge ("the ALJ") incorrectly determined that Canales was not disabled because she failed to properly weigh the evidence or fully account for his pain, depression, allegedly worsening symptoms, and other issues. Docket No. ("Dkt.") 46. The Commissioner opposed. Dkt. 48. This case is before me by consent of the parties. Dkts. 19, 20, 21. For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

### APPLICABLE LEGAL STANDARDS

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Sec'y of Health & Hum. Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C.§ 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters

entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Sec'y of Health & Hum. Services*, 955 F.2d 765, 769 (1st Cir. 1991). Substantial evidence means "'more than a mere scintilla.' . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal citation omitted). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Sec'y of Health & Hum. Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

The Commissioner employs a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; see *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Goodermote v. Sec'y of Health & Hum. Services*, 690 F.2d 5, 6-7 (1st Cir. 1982). At Step One, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At Step Two, the Commissioner determines whether the claimant has a medically severe impairment or combination

of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At Step Three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in Appendix 1 of the regulations, impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to Step Four, at which point the ALJ assesses the claimant's RFC and determines whether the claimant's impairments prevent the claimant from doing the work he has performed in the past.

An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant can perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final Step asks whether the claimant can perform other work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At Steps One through Four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Rodríguez v. Sec'y of Health & Hum. Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under Step Five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Sec'y of Health & Hum. Services*, 890 F.2d 520, 524 (1st Cir. 1989). Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Sec'y of Health & Hum. Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The following facts are drawn from the transcript ("Tr.") of the record of proceedings at Dkt. 34. Although I have reviewed the entire record, I only include portions of the record that are relevant to Canales's disability claim. In particular, I have excluded most portions of the record that significantly precede Canales's alleged onset date as well as some findings that are primarily repetitive or duplicative.

Canales was born on May 3, 1972 and is currently forty-nine years old. Tr. 44. His date last insured was on December 31, 2017. Tr. 35. Canales has his bachelor's degree, can understand and read English, and can speak simple English as well. Tr. 71-72. In the past, he had worked as a machine operator and as an administrative clerk. Tr. 43.

On January 9, 2002, an MRI was performed on Canales's lumbar spine by Dr. Angel Colon Loyola. Dr. Colon's impression was that Canales had early degenerative disc disease with a left lateral focal disc herniation with narrowing of the neural foramen and compression of one of his nerve roots. Tr. 110. By January 15, 2005, Canales had been diagnosed with lumbar strain and right sciatica after injuring his back and was not working for a period of time. Tr. 349. However, he was deemed able to return to work without restrictions on March 15, 2005. Tr. 350.

On December 17, 2007, Canales saw Dr. Ildaly Maldonado Aviles because he had hurt his back; most of Dr. Maldonado's findings are largely illegible, but she noted that she would treat his back pain with pills and appears to have also acknowledged that Canales had muscle spasms and inflammation. Tr. 112. On July 10, 2008, Canales saw Dr. Maldonado; he reported having suffered back pain and a herniated disc in 2004 and was currently experiencing back pain that radiated to his left leg. Tr. 111. Dr. Maldonado's findings are largely illegible. On July 11, 2008, radiologist Dr. Moises Acevedo conducted an abdominal ultrasound on Canales and found that he had diffuse

increased echogenicity of the liver suggesting diffuse fatty infiltration; Dr. Acevedo otherwise found that his results were negative. Tr. 122. On July 17, 2008, interventional cardiologist Dr. Orlando Marini Roman performed a non-invasive total visceral vascular evaluation on Canales, noting no abnormal findings. Tr. 119. On the same date, he performed a lower extremities venous study on Canales; it is unclear if he found that there was evidence of venous valvular insufficiency in Canales's legs bilaterally, as he stated directly opposing conclusions, but Canales's findings were otherwise normal. Tr. 120.

On April 10, 2010, Canales visited Hospital Buen Samaritano reporting that he had been feeling anxious for the past few days. Tr. 123. The hospital noted that he had no present or past history, that he walked in for treatment, that his physical state was stable and adequate, that his emotional state was expressive and relaxed, that his mental state was alert and oriented, and that he was at some potential risk for falls. Tr. 125. He apparently came to the hospital alone and was administered Geodon and Ativan. Tr. 127.

On April 15, 2011, radiologist Dr. Myrna Diaz Collazo conducted a chest PA and lateral on Canales, finding that his heart was normal in size and that his lung fields were well aerated, but that there were small nodularities on his right upper lobe suggesting small granulomas and that scoliosis and spondylosis of the thoracic spine was visible. Tr. 227.

On May 29, 2012, Canales was referred by Dr. Aracelio Camacho for twelve sessions of treatment for shoulder pain with a frequency of three times a week; it was noted that Canales should avoid falls and that he was cooperative, alert, and oriented to time, place, and person. Tr. 156.

On December 24, 2012, Canales visited a physician for an evaluation due to discomfort in his right hip; the person who treated him (it is unclear who) noted that Canales had pain radiating

to his testicles through his right leg, but that he was alert and had no breathing difficulties. Tr. 129. Canales was also noted to have a history of discogenic disease dating from 2005; he was also noted to have lumbar and thoracic spine issues and was diagnosed with lumbago, discogenic disease, a urinary tract infection, and prostatitis. *Id*.

On January 6, 2013, a radiologist found that there were signs of degenerative discogenic disc disease in Canales's spine; the radiologist made several other findings, including finding that there was an issue with one disc space but that the other disc spaces were normal and that vertical alignment was normal; however, most of the findings are illegible. Tr. 160.

On June 26, 2013, Canales visited a physician reporting lower back pain at a three out of five intensity as well as gastritis. Tr. 165. He was noted to be sixty-nine inches tall and weigh 271 pounds; was found to have no depression; was alert and oriented; was noted to require no assistance with getting dressed, bathing, using the toilet, transferring, remaining continent, or eating; and had entirely normal findings with regards to his appearance and bodily functioning, including his neck, lungs, extremities, and neurological aspects. *Id*. He was ultimately diagnosed with lumbago and muscle spasm. *Id*. The next day, he reported a back pain of four out of five and weighed 282 pounds; his findings were otherwise largely the same, he was noted to have lumbosacral and thoracic problems, and the diagnosis was that he was overweight. Tr. 166.

On October 21, 2013, Canales visited a physician reporting lower left molar issues; his back pain was noted to be a three out of five; he was noted to have a canker sore on his tongue; he had apparently had a pilonidal cyst surgery in 2002; he was noted to be a smoker; and he was diagnosed with oral aphthous, muscle spasms, back pain, and sciatic issues. Tr. 167.

On March 19, 2014, Canales visited a physician reporting difficulty with breathing. Tr. 177. He was diagnosed with bronchospasm, but otherwise his findings were normal. *Id*.

On September 9, 2014, Canales saw Dr. Cristina Benero Font and reported lower back pain and inflammation in his testicles at a five out of five pain level. Tr. 179. Canales was found to have lower back pain and muscle spasms, but his findings were otherwise normal. *Id*. Dr. Benero also noted that Canales did not drink alcohol or smoke. *Id*.

On September 10, 2014, radiologist Dr. Tomas Irizarry released a radiology report stating that Dr. Irizarry's impression was that Canales had thoracic spondylosis but no issues with his lumbosacral spine. Tr. 180. In support of this impression, Dr. Irizarry noted that Canales had minimal spondylosis on his thoracic spine, but well-maintained intervertebral disc spaces as well as vertebral body heights, intact bony alignment, no bony lesions, no fractures, and no subluxations. *Id*. Dr. Irizarry also made no abnormal findings regarding Canales's lumbosacral spine. *Id*.

On October 27, 2014, Dr. Benero found that Canales had a hyperemic pharynx with pharyngitis, muscle spasm, and back pain, but her findings were otherwise normal. Tr. 181. On November 18, 2014, Dr. Benero noted that Canales had abnormal glucose findings and furunculosis. Tr. 182.

On January 22, 2016, Canales visited Centro Isabelino Medicina Avanzada because he was feeling pressure and breathing difficulty in his lungs. Tr. 151. He was assessed with having cough variant asthma. *Id*.

On February 23, 2016, Canales visited Centro Isabelino Medicina Avanzada because a centipede had bitten him on his right buttock. Tr. 149. His examiner noted that his height was sixty-nine inches and his weight was 250 pounds. *Id*. Canales apparently walked in of his own accord despite experiencing mild cough and fever. *Id*. A physical exam revealed that Canales

appeared well-nourished and under no distress, not appearing to be ill; his neck and respiratory findings were normal; his musculoskeletal system revealed no atrophy or weakness, while he had good muscle strength, no abnormalities in his gait and no resting tremors, and good tone; his extremities revealed no clubbing, cyanosis, inflammation, petechia, or hematoma, while he had full range of motion and normal reflexes; and he was alert and oriented in person, place, and time, displaying no anxiety or agitation. *Id*.

On November 14, 2016, Canales visited Centro Isabelino Medicina Avanzada with discomfort in his throat. Tr. 146. His examiner noted that his height was sixty-nine inches and his weight was 250 pounds. *Id*. The findings were otherwise entirely consistent with those at his visit on February 23, 2016. Tr. 146-47.

On December 18, 2017, Canales visited Centro Isabelino Medicina Avanzada again and was noted to have a history of osteoarthritis, spurs, and herniated discs in his back; he was also noted to not be taking his medications. Tr. 194-95. He apparently had symptoms of asthma or tight chest as well as lower back pain and was assessed with intervertebral disc degeneration in his lumbar region and low back pain. Tr. 195.

On the same day, radiologist Dr. Josue Vazquez performed lumbosacral spine radiographs on Canales, finding that there was wedging of the lower thoracic vertebrae, no fracture, facet arthrosis in the mid and lower lumbar spine, and severe degenerative disc disease at L5-S1 and mild to moderate at L4-L5. Tr. 225.

On December 28, 2017, radiologist Dr. Ricardo de Jesus Gomez released his findings regarding an MRI taken of Canales's lumbar spine. Dr. de Jesus found that Canales's lumbar vertebral bodies were normal in height and alignment, that there was no evidence of acute fracture or subluxation, and that the paraspinal musculature and prevertebral soft tissue were unremarkable.

Tr. 224. Dr. de Jesus then noted that although the spine from L1-L3 was fully uncompromised, there was minimal diffuse disc bulging causing minimal flattening of the ventral aspect of Canales's thecal sac and very slight narrowing of the neural foramina bilaterally (more prominently on the left side) in part due to mild hypertrophy of the facet joints from L3-L4; very mild diffuse disc bulging causing minimal flattening of the ventral aspect of Canales's thecal sac and minimal narrowing of the neural foramina bilaterally in part due to mild hypertrophy of the ligamentum flavum and facet joints at L4-L5; and no disc herniation but mild to moderate left and mild right side neuroforaminal narrowing in part due to mild hypertrophy of the ligamentum flavum and facet joints at L5-S1. *Id*. Dr. de Jesus concluded that his impression was that spondylotic changes were resulting in mild to moderate multilevel neuroforaminal narrowing, but that the spinal canal was very capacious throughout and there was no evidence of spinal canal stenosis. *Id*.

On January 2, 2018, two days after Canales's date last insured, Canales visited Centro Isabelino Medicina Avanzada and was found to weigh 222 pounds; he reported pain in his back and in his right leg, and also noted being unable to sleep due to anxiety. Tr. 191-92. An MRI had apparently shown that he had minimal neural foramina stenosis in part of his back, but no spinal stenosis, and an abnormal glucose finding as well. Tr. 192.

On January 23, 2018, Canales visited APS Clinics alone with his chief complaint being sadness, though he also claimed to have anxiety, anhedonia, poor concentration, and low self-esteem, which he attributed to physical and emotional problems, court cases, and divorce. Tr. 278. He denied psychosis, mania, or having suicidal or homicidal ideas. *Id*. The level of reliability of his statements was found to be adequate. *Id*. Canales's appearance was noted to be heavyset; he was also noted to have appropriate clothing and hygiene, looked his reported age, had appropriate

verbal expression, and behaved in calm and cooperative fashion. Tr. 279. His gross motor skills were adequate, his fine motor skills were normal, he had no attention deficit disorder, his mood was depressed, his affect was restricted, he had normal control over his impulses, and his thought processes were logical, relevant, and coherent. Tr. 279. He had no delusions or suicidal or homicidal ideas. *Id.* Canales was oriented in time, person, situation, and space; his immediate, recent, and remote memory were intact; his ability to concentrate was adequate; his estimated intellect was average; his judgment was good; and his insight was adequate. Tr. 280. However, he was not found to be oriented in place, albeit without further explanation. *Id.* He was ultimately diagnosed with recurrent and severe major depressive disorder without psychotic features and an unspecified illness. *Id.* He was referred to a psychologist, was told to continue with a psychiatrist with another appointment in three months, and was prescribed Zoloft. *Id.*

On February 22, 2018, Canales visited APS Clinics alone again reporting multiple stressors and noting that he began to take Metformin in December. Tr. 270. Canales was noted to have a history of chronic back pain, non-insulin dependent diabetes mellitus, and mental illness. *Id.* Canales appeared to be thin rather than heavyset, was noted to have appropriate clothing and hygiene, looked his reported age, had appropriate verbal expression, and behaved in calm and cooperative fashion. Tr. 272. His gross motor skills were adequate, his fine motor skills were normal, he had no attention deficit disorder, his mood was euthymic and anxious (but not depressed), his affect was appropriate and anxious (but not restricted), he had normal control over his impulses, and his thought processes were logical, relevant, and coherent. *Id.* Canales was oriented in time, place, person, situation, and space; his immediate, recent, and remote memory were intact; his ability to concentrate was adequate; his estimated intellect was average; his judgment was good; and his insight was adequate. Tr. 273. He was again ultimately diagnosed

with recurrent and severe major depressive disorder without psychotic features and an unspecified illness. Tr. 275. He was prescribed Zoloft. Tr. 276.

On February 25, 2018, consultative examiner for the government Dr. Benjamin Cortijo noted that the medical evidence in the record was insufficient to reach a conclusion as to whether Canales had a disability. Tr. 424. Dr. Cortijo noted that there was some worsening shown on December 18, 2017 of structural deficits in Canales's lumbar spine, unusual wedging of Canales's lower thoracic vertebrae, and a chest x-ray from 2011 showing scoliosis of the thoracic spine, but no physical exam findings that might help determine how these structural deficits might affect Canales's ability to function. *Id*. Dr. Cortijo said that he would also request a physical exam regarding Canales's range of motion at his lumbar and cervical spine as well as his motor grade, sensation, gait with heel and toe walk, tandem gait, transfers, and a straight leg raising test in order to reach a proper conclusion. *Id*. On the same date, consultative examiner Carlos Jusino-Berrios noted that Canales had a severe discogenic and degenerative disorder of the back, but also found that in spite of Canales's allegations, the record was insufficient to establish the presence of a medically determinable mental impairment. Tr. 425. The examiners also found that there was insufficient evidence to determine whether or not Canales met Social Security Listing 1.04 (spine disorders) and that there was no indication that there was a medical opinion from any medical source regarding his condition. Tr. 425-26. The conclusion was that Canales was not disabled. Tr. 426. Upon reconsideration in July 2018, the consultative examiners concluded that the previous conclusion could be affirmed as written. Tr. 435-40.

On March 22, 2018, Canales visited APS Clinics alone yet again; he was noted to have a history of arthrosis treated with Gabapentin, Vitamin B12, and Glucosamine, as well as a history of chronic pain and mental illness. Tr. 262. All of his bodily systems were noted to be normal

except for his musculoskeletal system, as he was noted to have a history of arthrosis. *Id*. Diabetes

mellitus was not noted. Again, Canales appeared to be thin rather than heavyset, was noted to have

appropriate clothing and hygiene, looked his reported age, had appropriate verbal expression, and

behaved in calm and cooperative fashion. Tr. 264. His gross motor skills were adequate, his fine

motor skills were normal, he had no attention deficit disorder, his mood was euthymic but not

anxious, his affect was appropriate but not anxious, he had normal control over his impulses, and

his thought processes were logical, relevant, and coherent. *Id*. He had no delusions or suicidal or

homicidal ideas. *Id*. Canales was oriented in time, place, person, situation, and space; his

immediate, recent, and remote memory were intact; his ability to concentrate was adequate; his

estimated intellect was average; his judgment was good; and his insight was adequate. Tr. 265.

However, the ultimate diagnosis was that Canales had recurrent and severe major depressive

disorder without psychotic features as well as other problems related to his housing and economic

circumstances. Tr. 267.

On June 15, 2018, Canales's attorney filled out a function report on his behalf, with Canales

apparently supplying the answers. Tr. 103. Canales noted that he lived in a house with his family.

Tr. 94. He claimed that his medical condition has kept him from performing his work duties; that

he could not concentrate, that he was unable to complete tasks, that he could not meet his

obligations, that he felt anxious and desperate, and that he always felt out of control and lost. *Id*.

Canales reported spending his days doing things around the house, but not being able to

concentrate on individual activities and not being able to stay in one position for long due to back

pain, though he reported that he would get up, brush his teeth, and eat breakfast each morning. Tr.

96. He claimed that he did not take care of anyone else or any pets; that he could no longer work,

play sports, or read because he could not concentrate; and that he could not sleep because his

thoughts would keep him up at night. *Id*. However, he reported that he had no issues with personal care, that he did not need any special reminders to take care of his personal needs and grooming, and (apparently) that he did not need any help or reminders in order to take his medications. Tr. 96-97. He said that he did not prepare his own meals because he did not remember to or because he would forget what he was doing. Tr. 97.

Canales was able to do yard work on his own, though he noted that he needed help with the lawn mower and with picking up trash; he also noted that the yard work would take him almost all day and that he would do it every other week. *Id*. He would apparently go outside two to three times a week; would drive himself when going out but would not go out on his own because he would feel uncomfortable; would go grocery shopping about once every two months for around an hour and a half; and could pay bills, count change, handle a savings account, and use a checkbook on his own. Tr. 98. However, he claimed that his ability to handle money had changed since the onset of his conditions, but he did not explain how. Tr. 100. He reported watching television and using the computer two to three times a day but noted again that he could not concentrate and that the time he spent doing these things was shorter since before the onset of his conditions due to his back pain. *Id*. He would talk to others for a limited time approximately three times a day, but would go nowhere on a regular basis, though he claimed that he would not need to be reminded to go places and would not need anyone to accompany him if he was. *Id*. He also claimed to have no trouble getting along with others, though he also noted that he no longer went out to socialize, even with his family. Tr. 101.

Canales claimed to have trouble lifting, squatting, bending, standing, reaching, walking, kneeling, hearing, climbing stairs, seeing, remembering, completing tasks, concentrating, and getting along with others (despite his previous claim that he had no issues doing so); however, he

noted no difficulties with sitting, talking, understanding, following instructions, or using his hands. *Id*. He stated that he could lift between fifteen and twenty pounds, that his back pain kept him from making the same body movements that he used to, that his mental problems and anxiety kept him from concentrating or listening to other people for long periods, and that he could only walk for ten to fifteen minutes before needing to stop and rest for thirty minutes. *Id*. However, he reported being able to follow written and spoken instructions as well as being able to finish what he started. *Id*. He stated that he got along with authority figures fine, that he was fired before for not meeting requirements set by a job, that he handled stress by taking medication for short periods, that his anxiety increased when his routine changed or if he did not do something that he was supposed to do, and that he used glasses but no other assistive devices. Tr. 102. He also reported side effects from his medications, which included drowsiness, weakness, and tiredness from Gabapentin; hives from Metformin; nervousness from Tramadol; and sweatiness and anxiety from Zoloft. Tr. 103. He closed the report by noting that he suffered from dizziness, headaches, uncontrollable shaking hands and legs, blurred vision, instability, anxiety, and intermittent nausea, which he believed were all due to his medications and his mental condition. *Id*.

On October 18, 2018, Canales had a positive slump test conducted by Liznette Andujar, a physical therapy specialist; she also noted that he presented with pain and severe spasms. Tr. 388.

On December 11, 2018, Canales visited the physical therapy clinic La Esperanza reporting a lot of pain in his lower back and a general feeling of unwellness. Tr. 386. His hip, knee, and trunk areas were checked for muscle strength and range of motion; his range of motion was within the normal limits but his strength was only rated at three out of five for each body area and motion tested; furthermore, it was found that he could only move his knee with pain. *Id*. He could turn side to side and lie down independently, but could only sit or stand from a lying position with

weakness. Tr. 387. His balance was found to be generally adequate and good when sitting or standing, and his gait was noted to be antalgic but shuffling. *Id*. He was found to have inflammation, muscle spasms, some posture issues with his abdomen, and decreased cervical and lumbar lordosis. *Id*. He also had positive straight leg raising and slump tests. *Id*. The examiner concluded that his condition was not improving and that he was still experiencing pain and severe spasms; the examiner also recommended that he be evaluated by a physiatrist. *Id*.

On March 20, 2019, Canales visited a psychiatrist alone for an evaluation; he apparently displayed adequate response to and tolerance of his treatment, but also concern and episodes of frustration due to economic issues and legal and physical conditions, though he had no psychosis, delusions, mania, or suicidal or homicidal ideation. Tr. 402. The level of reliability of his statements was noted to be fair. *Id*. Canales appeared to be heavyset rather than thin, was noted to have appropriate clothing and hygiene, looked his reported age, had appropriate verbal expression, and behaved in calm, cooperative, and friendly fashion. Tr. 403. His gross motor skills were adequate, his fine motor skills were normal, he had no attention deficit disorder, his mood was euthymic, his affect was appropriate, he had normal control over his impulses, and his thought processes were logical, relevant, and coherent. *Id*. Canales was oriented in time, place, person, situation, and space; his immediate, recent, and remote memory were intact; his ability to concentrate was adequate; his estimated intellect was average; and his judgment was good; however, his insight was decreased instead of adequate. Tr. 404. The diagnosis was that Canales had recurrent major depressive disorder as well as anxiety disorder. *Id*.

On June 24, 2019, Canales again visited APS Clinics and underwent evaluations; Canales was noted to be heavyset, had appropriate clothing and hygiene, looked his reported age, had appropriate verbal expression, and behaved in calm, cooperative, and spontaneous (but not noted

to be friendly) fashion. Tr. 416. His gross motor skills were adequate, his fine motor skills were normal, he had no attention deficit disorder, his mood was euthymic, his affect was appropriate, he had normal control over his impulses, and his thought processes were logical, relevant, and coherent. *Id*. Canales was oriented in time but was not noted to be oriented in place, person, situation, and space; his immediate, recent, and remote memory were intact; his ability to concentrate was decreased; his estimated intellect was average; his judgment was good; and his insight was again decreased. Tr. 417. The diagnosis was that Canales had recurrent major depressive disorder as well as anxiety disorder. Tr. 418.

On November 17, 2019, Canales visited the Centro Isabelino Medicina Avanzada reporting that he had been experiencing pain in his back, right side, arm, leg, and neck for the past two weeks. Tr. 15. Canales was noted to have a history of diabetes and allergies, his height was sixty-nine inches, and his weight had apparently decreased dramatically to 148 pounds. *Id*. He was assessed to have lumbago with sciatica on his right side, administered Norflex via shot, and prescribed with Levaquin and Toradol. Tr. 15-16. Canales was noted to be alert, oriented, and walking in stable condition he also reported understanding the treatment and accepted it. Tr. 16. He also underwent a physical exam at the same location on the same day. His general appearance was well-nourished and he did not appear to be ill or in any distress; his respiratory findings were normal to good, the examiner noting that he did not use his accessory muscles to breathe; he had no musculoskeletal atrophy or weakness, possessed good muscle strength and tone, had no issues with his gait, and did not display any resting tremors; his extremities had full range of motion with normal reflexes, no petechia, no hematoma, no cyanosis, no clubbing, and no inflammation; and he appeared to be alert, unanxious, unagitated, and oriented in person, place, and time. Tr. 17-18.

The hearing before the ALJ took place on September 10, 2019. Tr. 51. The ALJ noted that Canales's date last insured was on December 31, 2017. Tr. 56. The ALJ heard testimony that Canales had experienced significant medical issues before the September 1, 2011 onset date of symptoms that he alleged for Social Security purposes, including an early degenerative disease in his back dating from 2002, allergic rhinitis, a fatty liver condition, and treatment for anxiety in 2010. Tr. 55. Canales testified that he had never been treated for or diagnosed with depression until two weeks before his date last insured, but that the condition had actually been present since 2012 or before. *Id*. He also noted that until two weeks before his date last insured, he had never been treated for an emotional condition besides his treatment for anxiety in 2010. Tr. 57.

Canales stated that he attempted to treat his condition with his lumbar spine by resting and trying not to use force, which he said would cause him to go numb throughout his whole right side, including his lower back and potentially his leg as well. Tr. 59. He also said that he essentially only went out to go to medical appointments and that he did not feel in the mood to go out in the way that he used to when he was young. *Id*. Canales seems to note that his doctors had not recommended surgery to him at the time of the hearing. *Id*. He said that he received a prescription for pain medication from a generalist doctor and attended thirteen sessions of physical therapy in 2013, but he did not receive any other physical therapy until 2017, only medication. Tr. 59-61. He did not receive a "block" allegedly because he has diabetes and he had an allergic reaction to injections in the past. Tr. 61. He also visited a chiropractor before his alleged onset date but not after. Tr. 61-62. He was able to spend time at home alone, help his wife perform household chores, drive, and attend medical appointments on his own. Tr. 62-63.

Canales apparently looked for work until 2012, at which point he stopped because of his lower back issues, his legs going numb, and possibly his emotional condition as well. Tr. 63. He

testified that he could only sit for half an hour at a time and walk for fifteen to thirty minutes at a time, though he stated that this was only an imprecise estimate based on his own perception of time; he also asked for permission to get up for a moment at the hearing. *Id*. He stated that he typically passed the time by watching television or using the computer. *Id*. He claimed to have periods where he would lose strength in his legs and where the numbness and pain in his legs was very strong, requiring him to lie down for forty to forty-five minutes at a time. Tr. 64. He noted that he takes Metformin for his diabetes and that his diabetes was diagnosed in 2017, but that he had had issues with sugar since 2013. Tr. 64-65. He also had begun taking Zoloft for depression in December 2017. Tr. 65. He claimed that he was having problems with attention and concentration before his date last insured despite findings that he had no concentration problems made around three months after this date. Tr. 66-67. Canales said that no radiological studies had been performed for his back and neck conditions. Tr. 67.

A vocational expert, Dr. Pedro Roman, then testified. Dr. Roman stated that Canales had performed the past job of technology operator; Canales noted that this was a position where he was operating machinery for the manufacturing of printer cartridges for Hewlett Packard printers and Dr. Roman then classified his former position as a machine operator. Tr. 69-70. Dr. Roman also noted that Canales had also worked as an administrative clerk. Tr. 70. Dr. Roman then testified that a person with the same age, education and vocational experience as Canales who was limited to light work, except that he could occasionally climb stairs and ramps, balance, stoop, kneel, crouch, but could not climb ladders, ropes or scaffolds or crawl, and who could occasionally operate foot controls, could perform Canales's past work as an administrative clerk; he also said that such a person could work as a cashier, a data entry clerk, a sales clerk, or an order filler, among other occupations. Tr. 70-71.

The ALJ issued her opinion on September 19, 2019. The ALJ noted that Canales's date last insured was on December 31, 2017. Tr. 35. She also found that Canales had not engaged in substantial gainful activity from his alleged onset date of September 1, 2011 through his date last insured. *Id*.

The ALJ then found that Canales had the severe impairments of lumbar degenerative discogenic disease and obesity. *Id*. The ALJ noted that Canales had diabetes as well, but noted that the record did not show that Canales had suffered complications from his diabetes, that Canalese had hyperglycemia listed as a diagnostic impression, and that although Canales had claimed to be suffering from some loss of vision in May 2015, that there was no evidence in the record connecting his purported vision loss to his diabetes. Tr. 36. The ALJ accordingly found that Canales's diabetes was a non-severe impairment without complications. *Id*.

The ALJ also stated that though Canales had cough variant asthma, had an x-ray in 2011 that showed nodularities on his right lung, and had complained of respiratory difficulties in January 2016, that the record as a whole suggested that Canales did not have recurrence of symptoms that required urgent care and that accordingly the record did not support that Canales had significant restrictions related to his respiratory issues. *Id*.

The ALJ then proceeded to analyze Canales's depression-related claims. The ALJ noted that Canales had claimed that after his employer laid him off, he became emotionally affected and was unable to seek further employment. *Id*. The ALJ also noted that Canales had supposedly been receiving treatment for depression, anxiety, and concentration deficiencies at a clinic since December 15, 2017, but that most of these appointments took place after his date last insured. *Id*. He had also complained of worsening mental symptoms since that time. *Id*.

The ALJ then analyzed the four functional areas set out in the disability listings for evaluating mental disorders such as depression (the "Paragraph B" criteria). The ALJ found that Canales had no limitations in any of the four areas. In reaching this conclusion, the ALJ noted that as for the first functional area of understanding, remembering, and applying information, Canales had alleged difficulties with remembering things, but that he did not manifest any significant difficulties with remembering during interviews (though one interviewer had described him as absent-minded), progress notes even from after his date last insured reflected that he had intact memory, and he had no trouble remembering relevant details and responding to questions during the ALJ hearing. Tr. 36-37. Regarding the next functional area, interacting with others, the ALJ noted that although Canales had alleged difficulties in getting along with others and appeared anxious during one interview, he was cooperative in a later interview and admitted to going shopping, doing yardwork with others, and living with others.Tr. 37.  As to the third functional area, concentrating, persisting, or maintaining pace, Canales alleged difficulties with concentrating and completing tasks and claimed that he could only remain attentive for ten minutes at a time, but an interviewer had noted that he had his papers well organized and could handle his own funds, he could drive and attended all his medical appointments alone, he provided logical and relevant answers to all questions asked during the ALJ hearing without any apparent difficulties, and he could shop, use the computer, and watch television without assistance. *Id*. Furthermore, the ALJ noted that progress notes after his date last insured supported the notion that he had no deficiencies in concentration, and the progress notes did not reflect any such deficiencies until June 2019, almost a year and a half after his date last insured. *Id*. In regards to the fourth area, adapting or managing himself, the ALJ said that Canales had not alleged any difficulties with taking care of his personal care needs and an interviewer had noted that although he had cried at an interview he

also appeared well-dressed and well-behaved overall; he attended medical appointments alone, drove, helped with household chores, used the computer, shopped, did yardwork, and handled funds. *Id*. As a result, the ALJ concluded that Canales's mental impairment was non-severe for Social Security purposes. *Id*.

The ALJ then concluded that Canales did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. The ALJ first noted that although Canales is obese, there is no listing for obesity, but that obesity can increase the severity of any coexisting or related impairments; however, the ALJ concluded that the evidence did not show that Canales's obesity increased the severity of any of his impairments. Tr. 38.

The ALJ then specifically noted Listing 1.04 (spine disorders) and proceeded to evaluate symptoms related to Canales's spine. The ALJ stated that despite Canales's degenerative disc disease, a lumbar spine MRI performed in December 2017, or within a month of Canales's date last insured, did not show any stenosis and only showed mild to moderate neuro-foraminal narrowing. *Id*. Meanwhile, a study performed in January 2013 showed moderate reduced disc spacing but with normal alignment and without evidence of spondylosis. *Id*. Though the ALJ noted that Canales had physical therapy for back pain ending in May 29, 2012 seeking to improve his trunk flexion and although the record reflected that Canales complained of back pain in September 2014, October 2014, and December 2014, there were no objective clinical signs supporting loss of function related to his spinal condition. *Id*. As a result, the ALJ concluded that Canales did not meet Listing 1.04. *Id*.

Regarding other potential factors, Canales apparently had medical appointments related to coughing in January 2016, a centipede sting in February 2016, and throat discomfort in November 2016. *Id*. The record shows that Canales had blood work done in December 2017 that showed

elevated glucose levels, with his testimony confirming he began the use of Metformin in December 2017. He was also prescribed Albuterol in December 2017 and the record reflected reports of cough variant asthma from January 2016. *Id*. The ALJ noted that despite the presence of obesity, however, the record did not reflect that he had complications in his respiratory or endocrine system. *Id*.

The ALJ then moved on to find that Canales had the RFC for light work except that he could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and operate foot controls; and he could never climb ladders, ropes, or scaffolds, nor could he ever crawl. Tr. 39. The ALJ noted that Canales alleged that after his employer laid him off, he became emotionally affected and was unable to seek further employment; that he listed several impairments precluding him from working, including a back injury, diabetes, and an emotional condition; that he had treatment for mental symptoms of depression, anxiety, and deficiencies in concentration at the APS Clinics since December 15, 2017; that he had worsening back pain and elevated glucose levels; that he had been prescribed Albuterol for his asthma; and that he had a body mass index of above thirty, making him obese. *Id*.

The ALJ first turned to Canales's diagnosis of lumbar degenerative disc disease, stating that he had been treated for back pain before the alleged onset date for the condition; that he briefly attended physical therapy in 2012 and that it was recommended that he attend physical therapy again almost a year after his date last insured; and that a year after his date last insured his symptoms did not show significant improvement, with Canales presenting with pain and inflammation along with positive straight leg raising and slump tests. Tr. 39-40. However, the ALJ found that Canales's treatment records were scant, that they did not support the alleged extent of

his symptoms, and that there were no objective clinical signs supporting significant restrictions in his ability to function during the period under consideration for disability purposes. *Id*.

The ALJ also noted that Canales was able to drive, do household chores with help, spend most of his time alone, and attend his medical appointments alone, and that although he attended pain management clinic, he only began to do so after his date last insured. Tr. 40. Although studies showed that he had degenerative discogenic disease, the ALJ noted again that a lumbar spine MRI performed less than a month before Canales's date last insured did not show any stenosis and only showed mild to moderate neuro-foraminal narrowing, while a study performed in January 2013 showed moderate reduced disc spacing but with normal alignment and without evidence of spondylosis. *Id*. The ALJ acknowledged that the studies from December 2017 did show wedging of the lower thoracic vertebrae and worsening of symptoms with structural deficits as compared to earlier findings, but also noted that there were no physical exam findings that would indicate whether or not this worsening of symptoms would affect Canales's functioning. *Id*. Accordingly, the ALJ found that that the record did not establish that Canales required frequent treatment for his pain. *Id*.

The ALJ went on to state that there are scant treatment records with gaps in treatment that are not consistent with the alleged intensity of Canales's symptoms. *Id*. The claimant had physical therapy for back pain for the last time as of May 29, 2012 and was apparently seeking to improve his trunk flexion. *Id*. Additionally, as previously noted by the ALJ, treatment records documented complaints from Canales of back pain in September 2014, October 2014, and December 2014, but without objective clinical signs supportive of significant restrictions in functioning. *Id*. Prior administrative medical findings support the idea that Canales's symptoms could be somewhat severe, but according to the ALJ, they were not accompanied by sufficient evidence to determine

Canales's functional abilities. *Id*. However, there is some evidence that Canales had thoracic spondylosis, and he also had a medical appointment in January 2018, just after his date last insured, at which he alleged that he was suffering from back pain with radicular right leg pain. *Id*. Again, Canales also had a lumbar MRI that showed mild to moderate neural foraminal narrowing without stenosis. *Id*. He was apparently recommended for further physical therapy in December 2018, almost a year after his date last insured, at which the record reflects he had no significant improvement in his pain and inflammation symptoms, signs of lower extremity involvement related to his spine disorder, and positive straight leg raising and slump tests. *Id*. Canales also attended a pain management clinic in March 2018, two to three months after his date last insured. Tr. 40-41. Overall, the ALJ felt that this evidence was too sparse and full of gaps in treatment to suggest that Canales had symptoms as severe as he alleged, but did conclude that Canales had anatomical abnormalities including reduced mobility of his spine secondary to his pain requiring physical therapy during the relevant time period. *Id*.

The ALJ then concluded that Canales could perform the exertional demands of light work. Tr. 41. The ALJ found persuasive the findings from a year after Canales's date last insured that Canales did not have significant improvement in his pain and inflammation and that he had clinical signs of positive straight leg raising. *Id*. The ALJ also noted that he had constant leg movement and difficulty sitting. *Id*. However, the ALJ stated that Canales's own testimony confirmed that he had adopted a limited homebound lifestyle but that he drove to his medical appointments alone, that he could use the internet and watch television, and that he was able to perform household chores with help. *Id*. The ALJ determined that the record as a whole showed that Canales could perform light work during the period in question.

The ALJ did conclude that some additional RFC limitations would apply to Canales beyond the standard "light work" limitations, however. For instance, the ALJ concluded that Canales required additional non-exertional postural limitations because he had required physical therapy in 2012 to improve flexion of the trunk. *Id*. The ALJ also noted that Canales had been observed to have "constant leg movement" and that he would require additional restrictions with respect to his ability to operate foot controls as a result. *Id*. The ALJ then stated that Canales could never climb ladders, scaffolds, or ropes in part because he complained of side effects from his medications that led to somnolence and drowsiness. *Id*. She also found that Canales could never crawl considering the combined effects of his lumbar spine disorder, obesity, and statements about numbness in his extremities when sitting to use the computer. Tr. 41-42.

The ALJ then concluded that Canales did not need any RFC tailoring with respect to potential exposure to respiratory irritants because the record did not document that he had persistent respiratory difficulties. Tr. 42. Although the record reflected that Canales had a cough in January 2016, had throat discomfort with auscultation in November 2016, had wheezing issues in December 2016, and was prescribed albuterol for asthma in December 2017, according to the ALJ there were no further complications stemming from any of these issues documented in the record. *Id*. As a result, the ALJ did not find that any additional RFC limitations were necessary in response to Canales's respiratory condition.

The ALJ summarized her RFC findings by stating that her assessment was supported by the medical treatment records, all of which suggest a greater sustained capacity than that alleged by Canales. *Id*. The ALJ noted that the evidence of treatment was scarce, but that she considered that the evidence received at the hearing level along with testimony and other evidence determined the extent of Canales's limitations. *Id*. In particular, the ALJ noted that whether or not Canales's

appointments were frequent, which she believed they were not, Canales was not found to have deficiencies in concentration until almost a year and a half after his date last insured. *Id.* The ALJ also noted that Canales started treatment for back pain before the period at issue actually began, but only sought infrequent treatment afterwards, including physical therapy in 2012, and that the record reflected that he was otherwise able to manage the pain with medication. *Id.* The ALJ therefore concluded that the type of treatment documented by the record did not support Canales's alleged degrees of pain and other limitations. Tr. 43.

The ALJ then proceeded to evaluate whether or not Canales could perform his past relevant work. The ALJ found that Canales could not perform his past relevant work as a machine operator, as this position required medium exertion and Canales was limited to light work. Tr. 43. However, the ALJ found that the vocational expert's testimony permitted the conclusion that Canales could perform his past relevant work as an administrative clerk. *Id.* In support of this determination, the ALJ noted that the position only required light exertion, accommodated Canales's postural restrictions under the ALJ's RFC findings, and did not require the use of foot controls. *Id.* The ALJ also stated that the vocational expert had found that someone in Canales's condition could also work as a cashier, a sales clerk, or an order filler; the ALJ therefore found that Canales could perform those jobs as well. Tr. 44. As a result of all this, the ALJ determined that Canales was not under a disability at any time from his alleged onset date to his date last insured. Tr. 45.

## DISCUSSION

Canales cites no objective medical evidence from the record in support of his motion to overturn the ALJ's determination (except in the process of citing the ALJ's determination), instead relying entirely upon the premises that his statements at the hearing before the ALJ indicated that his symptoms were worse than the ALJ's determination suggested they were and that the ALJ's

determination was flawed because she failed to fully account for his pain, depression, allegedly worsening symptoms, and other issues. Nonetheless, I have reviewed and considered the entire record in ruling upon Canales's motion.

Canales argues that because his symptoms began before his date last insured and his condition has worsened since his symptoms began, the ALJ should have found him to be disabled. However, even if the premises underlying this claim were entirely true, Canales has not explained why such a finding would be imperative. It is true that "where contemporaneous medical evidence is lacking, [post-date last insured] medical records may support a finding that the claimant's impairments were severe prior to her [date last insured] . . . ." *Fischer v. Colvin*, 831 F.3d 31, 36 (1st Cir. 2016). The ALJ acknowledged Canales's subjective claims that his depression was worsening, noted that objective evidence from December 2017 indicated that his spine condition appeared to be worsening, and admitted that Canales's symptoms generally did not appear to show any improvement before his date last insured. Nonetheless, the ALJ reasonably and validly concluded through reasoned and thorough analysis of the record – including analysis of evidence postdating Canales's date last insured – that despite these claims, trends, and symptoms, Canales's overall condition did not reach the level of a disability before his date last insured. Canales identifies no legal principle that suggests this conclusion should be overturned.

Canales also argues that he is being penalized by the ALJ for not visiting the doctor enough, suggesting that he did not have the capacity or inclination to regularly seek out treatment due to his depression, willingness and ability to "tough out" pain, and other factors. He appears to believe that the ALJ improperly concluded that since Canales's treatment history is relatively scant and does not include certain findings, Canales must not be disabled. Despite Canales's protests, such observations are valid for an ALJ to make in the process of concluding that a plaintiff is not

disabled. *See, e.g., Cruz-Guadalupe v. Comm'r of Soc. Sec.*, 08-CV-1475 (JAF) at \*3 (D.P.R. Sept. 1, 2009) (upholding a ruling in which the ALJ cited the dearth of medical evidence in the record supporting the plaintiff's allegations of disability in ruling against the plaintiff). Additionally, in the present case the ALJ did not rely solely upon such logic. Rather, though the ALJ did note that gaps in Canales's treatment are not consistent with the symptoms he alleges, the ALJ also reasonably found that the record as it does exist, complete with information provided by Canales himself and with opinions from medical experts and treating physicians, was sufficient to support a finding that Canales is not disabled. The ALJ also cites evidence that tends to suggest that Canales had the capacity to seek out treatment as needed despite his claims; for instance, the ALJ notes that Canales was able to attend his medical appointments alone, drive, understand and provide information, handle his own papers, and interact adequately with others. Along the same lines, the record reflects that when Canales did seek out treatment, he displayed few to no signs of symptoms that would prevent him from seeking out further treatment in the future. Finally, before Step Five the burden of proof is on Canales to show that he suffers from a disability by providing evidence sufficient to support such a determination. *See, e.g., Rodríguez*, 944 F.2d at 5.

Furthermore, the suggestion that Canales was unwilling to visit the doctor because he hoped to "tough out" the pain or that he was unable to do so because of his depression is entirely unsupported by the record. Instead, the record shows that during the period in question, Canales frequently and voluntarily sought out treatment for conditions as diverse as a canker sore, Tr. 167, the common cold on multiple occasions, Tr. 168, 175, and a centipede bite on his right buttock. Tr. 149. Without evaluating the severity of these conditions, it is clear that Canales had few qualms about visiting the doctor when he deemed that it was necessary to do so.

Along these lines, even if Canales's symptoms have now worsened to the point where he is disabled, he would have had to reach this point before his date last insured in order to be guaranteed disability. *See, e.g., Cruz Rivera*, 818 F.2d at 97; *Patoski v. Berryhill*, 320 F.Supp.3d 283, 293 (D. Mass. 2018) (finding that it was suitable for an ALJ to discount the opinions of treating physicians in part because they rendered their opinions based on observations of the plaintiff made after the plaintiff's date last insured); *Cruz-Guadalupe*, 08-CV-1475 at *3 ("This evidence is irrelevant, as it falls outside the relevant period"). Additionally, portions of the record postdating Canales's date last insured do not clearly support the notion that he is disabled anyway. The only evidence postdating Canales's date last insured and not already mentioned that might support further limitations for Canales is a finding of diminished concentration from June 2019, which the ALJ recognized and discussed in some detail in her opinion. This evidence might arguably support the conclusion that Canales had a mild to moderate limitation when it came to concentrating, but only well over a year after his date last insured, and such a limitation would not alter the overall calculus as to whether Canales has a disability anyway.

Canales also implicitly challenges the ALJ's RFC determination, suggesting that the ALJ failed to support her RFC determination with substantial evidence. In forming this claim, Canales characterizes his depression as "moderate" and argues that the ALJ failed to consider how his moderate depression would impact his ability to work and to seek medical treatment for his physical and mental ailments. It is unclear upon what grounds Canales characterizes his depression as moderate. The ALJ found that Canales's depression did not cause him more than minimal limitations in his ability to perform basic mental work activities and also noted that he had no limitations as to the areas of mental functioning set out in the disability regulations, concluding that Canales's depression was not severe. Furthermore, the ALJ provided extensive, reasoned

analysis of how depression might impact Canales's ability to work and also included analysis that touched on Canales's ability to seek out medical care, including reasonable and well-supported findings that his depression did not prevent him from driving, attending medical appointments on his own, understanding or providing information, handling his own papers, or interacting adequately with others. It is therefore simply not the case that the ALJ "failed" to consider the effects of Canales's depression on his ability to work and to seek out treatment; rather, the ALJ considered the potential effects of his depression but determined that he could work anyway. Moreover, the ALJ's findings in this regard are well-supported by evidence from the record.

In further support of the ALJ's RFC determination being reasonable, thorough, and based upon substantial evidence, the ALJ placed particular stress on findings from December 2018 that Canales did not have significant improvement in his symptoms of pain and inflammation but did have clinical signs of positive straight leg raising. The ALJ discussed these findings at length and found them to be "persuasive" and "valuable," even though findings made after the date last insured are frequently (and often reasonably) dismissed outright by ALJs. Nonetheless, the ALJ reasonably concluded that despite these findings, Canales could still perform light work, though partially in response to these findings the ALJ attached further limitations to Canales's RFC. The ALJ thus took the fairly unusual step of granting credence to evidence gathered almost a year after Canales's date last insured in evaluating whether Canales's condition had worsened enough for him to have a disability, but nonetheless reasonably concluded that Canales was not disabled.

The ALJ also did not shy away from analyzing Canales's personal statements and claims when evaluating Canales's RFC, including comments about his subjective experience of symptoms related to pain. "[The ALJ is] free to find that appellant's testimony regarding his pain and exertional limitations is not credible. . . . This result, however, must be supported by substantial

evidence and the ALJ must make specific findings as to the relevant evidence he considered in determining to disbelieve the appellant*." Da Rosa v. Sec'y of Health & Hum. Servs.*, 803 F.2d 24, 26 (1st Cir. 1986). "[T]he administrative law judge [must] consider six factors in evaluating a claimant's subjective allegations of pain: (1) The nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) Precipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3) Type, dosage, effectiveness, and adverse side-effects of any pain medication; (4) Treatment, other than medication, for relief of pain; (5) Functional restrictions; and (6) The claimant's daily activities." *Musto v. Halter*, 135 F.Supp.2d 220, 227 (D. Mass. 2001) (citing *Avery v. Sec'y of Health & Hum. Servs.*, 797 F.2d 19, 29 (1st Cir. 1986)). As the ALJ notes, there is little objective evidence in the record as to Canales's pain or to the existence of these six factors. Nonetheless, the ALJ discussed the first factor (the nature, etc. of the pain alleged by Canales) in some detail and throughout her opinion; placed RFC limitations upon him based in part upon his subjective testimony regarding how sitting for long periods would lead to numbness in his legs; discussed treatment that Canales received other than medication for relief of pain, including physical therapy; noted that Canales was able to manage his pain with medication and discussed how Canales's pain medications affect him, limiting him to never climbing ladders, scaffolds, or ropes due to side effects from his pain medication; established other functional limitations for Canales while considering how pain limits his ability to perform light work; and discussed Canales's daily activities in detail. The ALJ also discussed whether the medical record fully supported Canales's claims regarding his pain, but reasonably concluded that the intensity, persistence and limiting effects of the symptoms alleged by Canales were not entirely consistent with the medical evidence. I therefore find that the ALJ adequately considered Canales's subjective claims regarding the pain he has purportedly experienced.

Canales states that it was "illogical" for the ALJ to find that Canales had persistent pain while denying him disability, but it is unclear why this would be the case. The ALJ, of course, may find that an individual has lasting symptoms like pain without automatically granting them disability as a result. In practice, while the ALJ acknowledged that Canales suffered from persistent pain due in no small part to his comments regarding his subjective experience of pain, she also found that his statements concerning the intensity, persistence and limiting effects of his symptoms were not fully supported by the medical record, in part because the record shows that Canales did not seek out frequent or regular treatment for his pain and because the record as a whole suggests that Canales was able to manage his pain with medication. Such a determination is reasonable and well-supported by medical evidence in the record.

Even if the ALJ made a mistake at some point in her determination, Canales has not identified any such error; even if he had, after reviewing the record I have seen nothing to suggest that any error made by the ALJ would be anything but harmless, as there is relatively minimal objective or opinion evidence from before Canales's date last insured that would even arguably suggest he is disabled. Throughout his motion, Canales appears to implicitly claim that the court should give almost dispositive credence to the subjective claims of plaintiffs even if the medical record provides little to no support for their claims. While it is true that pain symptoms in particular are highly subjective and a plaintiff's statements should certainly be taken into account when determining whether he has a disability, this does not mean that Canales's statements and claims should be treated as dispositive: such a practice would permit essentially anyone to collect disability at will. In practice, the ALJ did an exemplary (if somewhat repetitious) job of detailing her findings as to Canales's symptoms and conditions at each step of her opinion, going through pertinent portions of the record in detail, providing analysis of Canales's subjective claims, noting

*Canales-Cancel v. Comm'r of Soc. Sec.*, Civil. No. 20-1469 (BJM)                                    33

where such claims were and were not supported by objective medical evidence from the record,

and even providing detailed consideration of medical evidence that arose well after Canales's date

last insured. As a result, I affirm the ALJ's determination that Canales is not disabled.

**CONCLUSION**

For the foregoing reasons, the ALJ's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 31st day of March 2022.

S/ *Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge